## Consolidation Coal Company v. Branham et al.

(Decided May 13, 1932.)

E. C. O'REAR and J. E. CHILDERS for appellant.

HAWK & LEWIS for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—
Affirming.

Colbert Branham was in the employment of the Consolidation Coal Company and working under the Workmen's Compensation Act (Ky. Stats., sec. 4880 et seq.). This proceeding was instituted before the board to recover compensation for his death in the course of his employment. The board allowed compensation. The coal company took the case to the Leslie circuit court, which confirmed the award of the board, and it appeals.

The facts shown by the proof for the plaintiff, briefly stated, are these: Colbert Branham was running a motor, and Arthur Terry was working with him. They had been at work from about 6:00 p. m., most of the time on the outside of the mine in a steady rain shifting cars. They were both wet all over. About 10 o'clock they went to the inside of the mine after rail trucks to haul rails. Branham was running the motor. When they came to the switch Terry got off the motor and went 10 feet from the motor to remove a block from under the rail truck, so that it would roll to the motor. When he reached down to remove the block he heard the motor start and looked around and saw the motor going to the outside. Branham was standing there striking at the wire. Terry walked up to him and hit him in the back and he muttered something and fell down, or Terry helped him down. In a few minutes he was dead without regaining consciousness. The electric power which ran the motor was conveyed by an uninsulated cable, which was 57 inches above the rail. The motor seat was 30 inches above the rail. The voltage on the cable was sufficient to kill a person. In order to change the pole on the motor so as to run the car back Branham had to rise up and reach back for the pole. While Terry did not see what he was doing, his conclusion was that Branham was turning the pole; for that was what he in the usual course of the business was expected to do while Terry dropped the rail trucks down. The pole is always behind, but he did

not get the motor pole turned. Terry did not see what occurred, but, from what he saw and their usual way of doing the work, the natural inference may be that Branham had gotten up to turn the pole and came in contact with the trolley wire; his knee struck the controller, and this started the car back; for, in the absence of proof to the contrary, Branham may be presumed to have followed the usual course of the business. Terry was about 10 feet from him at the time he was striking at the wire with his arm, and he went right back to him; he had stepped from the motor and was sinking down when Terry got to him. The accident occurred on October 24, 1929.

The proof for the defendant was, in substance, this: Two doctors made an autopsy of the body of Branham on the next night. They found that all of the valves of his heart were more or less affected, indicating a prior infection and diseased condition of the organ. They found blood clots in the coronary artery at the first biforcation, which completely blocked it. They also found an additional clot of apparently several days standing in some of the smaller portions of the artery which indicated that the clot had been formed several days prior to his death. They did not find any sign of an electrical burning anywhere on his person, and they gave it as their judgment that Branham died from heart trouble and not electrical shock. But the medical testimony also showed that, with the conditions existing in the blood vessels that they found, Branham would not have been able to carry on his work.

On the other hand, the proof for the applicants was that Branham was twenty years old; weighed 195 pounds; was 6 feet tall and strong and healthy. He had been raised by his grandmother, who lived on a farm, and he worked the farm. There had never been any trouble with his health. He was stout and strong. He had left the farm and gone to work for the coal company about three months before the cacident. He had worked regularly; there had been no trouble, and he was healthy and strong. Terry, who worked with him, never heard of any heart trouble. He had worked on Saturday night; Sunday he went by to see his uncle, then went to his grandmother's and stayed all night. Monday he came back by his uncle's, and from there went on to the mine to work. All the people who saw him during that time said he was apparently in perfect health.

It is earnestly insisted for appellant that Terry did not see what occurred, and that there is no evidence to sustain the finding of the board that Branham came to his death from an electrical shock. But these facts do appear. The motor was run by a pole extending from it to the trolley wire. It was attached to the motor with springs, and to reverse the motor one must pull it down off the wire and turn it around on a swivel. To do this it was necessary for Branham to rise up out of the seat. He had a cap on his head with a burning lamp attached to it when Terry got off the motor. Just as Terry reached down for the block, Branham, in the usual course of the work, naturally reached for the pole, and his knee hit the controller, which started the car back, throwing Branham's head in the zone of the trolley. His cap was found after the accident on the other side of the track with the light out, and when Terry saw Branham he was shaking convulsively and the motor was running wild. The cap showed a mark of rust or mud across the top of it. While the doctors testified that they found no mark like a burn, a number of witnesses for the applicant testified that there was a crisped and parched place across his nose.

Emphasis is placed by appellant on the fact that Branham's seat was on the left side of the motor, and that, if he had raised up, the trolley would not have been over him. But the car was going into the switch and this would bring him nearer to the trolley. Emphasis is also placed in the fact that there were no two burns on his person. But water is a fine conductor of electricity, and, as his clothes were wet, this may account for the fact that there was no other burn. In fact his wet clothes made a fine conductor. The doctors testify that it had been reported to them that he had been treated by a doctor for heart trouble before this. But the testimony of the doctor is not in the record.

The well-settled rule of this court is not to disturb the finding of the board in cases of this sort, if there is any evidence to support it. The court cannot say here that there was no evidence to support the finding of the board. If the proof for Branham was true, he was not suffering from heart trouble before this, and his death was due to the electric shock which may also have produced the conditions which the doctors found. The credibility of the witnesses was for the board. The court

cannot say that there was no evidence warranting the award of the board. Its action cannot be disturbed here if there is any evidence to sustain it.

Appellant also complains that the award should have been apportioned, the evidence showing that Branham was suffering from heart trouble, and that, under the evidence, at least, his death was due to both causes or contributed to by both. But, as we have said, the finding of the board was a finding that he was not suffering from heart trouble and did not die therefrom, and this finding of the board cannot be disturbed under the proof.

In Louisville Gas & Electric Co. v. Duncan, 235 Ky. 613, 31 S. W. (2d) 915, this court affirmed a judgment of the circuit court awarding compensation for death by electrical shock, on proof by applicants much like that here, although the board had refused compensation.

Judgment affirmed.