# Utley v. Pence et al.

Nov. 9, 1943.

Doolan, Helm, Stites & Wood for appellant.

Jesse Y. Hubbard for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

This is an appeal from a judgment of the Jefferson circuit court confirming an award made by the Workmen's Compensation Board to appellee who received an injury on June 14, 1940, while in the employ of appellant. It was stipulated that appellee and appellant had both accepted and were operating under the Kentucky Workmen's Compensation Act, KRS 342.001 et seq.; that appellee was in the employ of appellant on June 14, 1940, and received an average weekly wage of $50 per week; that he received an injury by accident arising out of and in the course of his employment for which appellant admits liability; that all the facts as to the employment and liability are stipulated and agreed to be existing, and that the only question for the board to determine are the amount and extent of the injury.

The evidence was heard before a referee of the board who rendered an opinion making his finding and award, allowing appellee $15 per week for twelve weeks temporary total disability, but denied compensation for permanent disability in any degree. Appellee petitioned the board for a hearing before the full board and on June 4, 1941, the full board entered an order in which it stated, in substance, that the medical testimony contained in the record was so conflicting that it created a doubt in the minds of the members of the board as to

whether a proper conclusion could be reached from the record as it then stood, and set aside the original order of submission and reopened the case for further investigation of appellee's injuries. The board then directed appellee to submit himself for an examination by Dr. John B. Thawick who examined appellee, and being unable to satisfy himself about his condition, referred him to Drs. R. Glenn Spurling and Everett G. Grantham who also examined appellee and reported that there was no demonstrable pathology to account for his complaints. Dr. Thawick thereafter made a report to the board based upon his own examination and the report received from Dr. Grantham, and after stating the symptoms, condition, etc., of appellee he concluded his report as follows: ''This man, in my opinion, is lacking in essential vitamins, and has not been able therefore, to react normally to a jarring shake-up he received. He impresses me as being a man who is entirely lacking in the elements which the vitamin $B_x$ preparations might supply. I have taken the liberty, therefore, of prescribing that line of treatment. You will immediately ask, will this line of treatment cure the condition in the hip and knee. No, I am afraid not, and it is on this that I am basing my recommendations for 25% permanent, partial disability. The man is not totally disabled, but at his age and with his temperament, with the long established nutritional deficiency from which it will be difficult for him to recover, the disabling in his knee and hip, left side, are apt to be, as I have said, permanent. I believe therefore, it would be fair to pass over all consideration of total disability, permanent or otherwise, and give this man a 25% permanent, partial. If the Board desires, let this ruling be established and send the man back again after six months for additional investigation. I do think he should be referred to a competent internist who can follow up his constitutional defects. I will recommend such a doctor to the Board, if you so desire.''

On October 21, 1941, the board entered another order reciting the uncertain condition of the evidence and directed that the case be continued until January, 1942. In the meantime, Dr. Thawick referred appellee to Dr. Raymond Heitz for treatment, and on January 29, 1942, Dr. Heitz made his report to the board in which he stated that he saw appellee on December 29, 1941, January 14, 1942, and January 22, 1942; that at the time of

his first examination appellee complained of suffering pain in the left hip and groin and walked with a definite limp, and that his condition had changed very little at the last examination on January 22, 1942. He said he was of the opinion that appellee still had a partial disability of at least 25% and was still under his treatment. After receiving the report from Dr. Heitz the board delivered an opinion on April 21, 1942, in which it found that appellee had suffered a 50% disability, and awarded him $6 a week for a period of 322 weeks. Appellant appealed from the order of the board to the Jefferson circuit court which, as stated above, was confirmed.

Appellant urges a reversal of the judgment insisting (1) that there is no evidence of a substantive or probative nature tending to show that appellee is now suffering any permanent disability, and (2) if he has any permanent disability in any degree it is not as much as 50% as found by the full board. This brings us to a consideration of the evidence heard before the referee, in addition to the reports of the doctors indicated above, which, by agreement of parties, were treated as their evidence.

Appellee testified that a ladder on which he was working tripped and threw him off and he fell on a pile of lumber two and one-half feet high and the end of the lumber hit and bounced up and hit him across the back and doubled his legs back under his body and the lumber fell on him. He said the timber struck him across the sacrum and injured his sacrum, hips and back. They immediately sent him to the hospital where he remained three weeks and four days, during which time he was attended by Dr. Bate. He said Dr. Bate came in one morning and said: "Sit up as much as you can today and get up tomorrow and walk around. The next day you are going home." He said when he got up to walk the only way he could get around was with his hands on a chair. Later he was examined and treated by Dr. Humphrey, who prescribed a brace for his back and taped his back for the first time. Dr. Humphrey asked him where his brace was and he told him that he did not have one and the doctor said: "You mean the doctor let you out of the hospital in that condition without a brace?" He described other treatments given by Dr. Humphrey and Dr. Humphrey finally suggested that he see Dr. Glenn Spurling, and later said that Mr. Whitfield, a representative of the insurance company, sent

him to see Dr. Spurling who gave him an examination and prescription and suggested that he see his family doctor. He told Dr. Spurling that he had no doctor himself but that Dr. Charles Bush had taken care of his daughter and family. He said that Dr. Bush told him that there was nothing further that a medical doctor could' do and that no further treatment he could give would do him any good. He said he was still wearing the brace prescribed by Dr. Humphrey and that he could not get along without it; that he stayed in bed 16 or 18 hours a day and still suffered as a result of the injury and could not walk without the support of a cane. He said he had been a carpenter for about 16 years and during that time he had been disabled only about one day because of a "turned ankle" about four years ago; that he had never had any venereal disease of any kind and suffered no disability or illness previous to the injury complained of. He was asked if he was able to do carpenter work at that time and he answered and further testified as follows:

"Well, the fact of the matter, I can't do anything, can't stay in one position any length of time, can't stoop over, never bend much but what this hip draws up about three inches in my body.

"Q. Which hip? A. Left. When you take pressure on this—

"Q. On what? A. The two bones with the muscles between them.

"Q. Can you sit flat on a chair? A. No, sir.

"Q. Were you able to sit flat before this accident and injury? A. Absolutely, climb anything any place.

"Q. You have been pretty regularly employed all the time up to the time you were injured? A. Yes, sir.

"Q. Mr. Pence have you lost any time previous to this injury by reason of any other injury or any sickness? A. No, sir, only except a day at the race track with a turned ankle."

Dr. Alex F. Gross testified that he was a graduate of the Pennsylvania College of Naturopathy and Physiotherapy at the University of Pennsylvania at Philadelphia and had been practicing for ten years and that he was a radionics diagnostician and made a radionic diagnosis of appellee on September 29, 1941. He said

his examination revealed that there was a destruction of nerve tissue in the spinal cord in the region of the first and second lumbar and the sacrum. He made his examination in the presence of Dr. Alexander and Dr. Eversole. He was asked to explain how he came to his conclusion and what a radionic examination is, and he explained as follows: "Yes, first of all, let me explain what radionics is. Radionics is a science of detecting and treating disease by the action upon magnetic waves produced by the vibrations of electrons. Radionic testing, radionic diagnosis, this is based on the well known theory that all substance is maintained by its own specific rate of vibration, which is controlled by its atomic structure. That is the definition of radionics." He further explained that since the examination revealed destruction of the nerve tissue he thought the disability was permanent and total and he did not think that any cure could be given for it and the best that could be done would be to give temporary relief; that every indication was that the injury was caused by trauma. He further said, however, that radionic examinations were not used in hospitals because it was not endorsed by the American Medical Association, but a number of medical doctors send patients for radionic examinations; that he held clinics (radionic) for doctors in the State of Ohio and also held clinics for Dr. Alexander in Louisville, Kentucky.

Dr. Alexander testified that he was a graduate of the National School of Drugless Physicians and also held a Kentucky license to practice the profession of Physiotherapy which is recognized in Kentucky; that he was present when Dr. Gross made the radionic examination of appellee and Dr. Gross furnished him a chart of the finding of his diagnosis. He said the chart showed that there was nerve destruction with a progressive nerve tissue degeneration in the fourth and fifth lumbar region as well as in the sacrum and whenever nerve tissue is destroyed there is no repair. He said that in his opinion appellee's disability was permanent and total and that he would never be able to perform his occupation as a carpenter.

Dr. Eversole, a graduate of the Medical School of the University of Louisville and a regular licensed and practicing physician in Kentucky, testified that he made physical and clinical examinations of appellee. He was asked to tell what he found or to describe the condition

of appellee, and he answered: "I found that on pressure there was tenderness over the cervicle vertebrae; that is, over the spine at the neck; and tenderness over the lumbar spine; that is, the lower spine, with some evidence of fusion of the intervertebral discs with a half restriction to lateral motion; and a complete restriction to rotation in that the lower part of the spine would turn the other portion of the body. I found his orientation to time and place was normal, mind partially cloudy as to events that happened immediately and in the past too; patella reflexes were slow in responding and the abdominal reflex was practically no response at all." He was asked to what extent the injury was as to total and permanent disability, and in response to that question he read from his records as follows: "This man is wearing a brace which is absolutely essential; he must have the support of a cane or something to get about; there is little more anyone can do for him other than giving treatments to try and ease the pain to some extent; that he is permanently and totally disabled from work of any kind is plainly evident from the history and physical and clinical examination." He further said that after the radionic examination was made Dr. Gross started to tell him his findings and he asked him not to tell him anything or give him any information until after he had made his own examination, and his examination disclosed similar or like symptoms and facts as disclosed by the radionic examination. He said he found an injury to the lower vertebra, or the lower portion of the spine, with a resulting pressure on the spine causing degeneration of a sclerosis process in the spine proper and there was actual injury to the vertebra. He said that he made no X-ray examination of appellee "but the way these vertebrae rest, one on another, lots of times it is more in the form of a slight displacement or dislocation; then of course the X-ray would be of little or no value." He further said there was nothing that the medical profession could do as a permanent relief and that all the treatment he could get would be only a temporary relief.

The evidence of the witnesses for appellee is more or less contradicted by other doctors who testified for appellant. They made X-ray examinations of appellee and apparently thoroughly investigated his condition and expressed the opinion that he had at least a 25% disability. It is insisted for appellant that since radionic

examinations are not recognized by the American Medical Association, and Dr. Gross is not a licensed practicing physician in this State, his evidence, as well as that of Dr. Alexander, should be given but little if any consideration. But, without passing upon that question, it must not be overlooked that Dr. Eversole is a licensed practicing physician of this State and his evidence with respect to the nature of the injury of appellee and the extent of his disability correspond with and corroborate the evidence of Dr. Gross and Dr. Alexander. Dr. Eversole did not rely upon information received from Dr. Gross as to the symptoms disclosed by the radionic examination but made his own independent examination and finding which incidentally corresponded with that of the radionic examination. It is the recognized rule that if there is any evidence of a substantive or probative nature tending to support the findings of the Workmen's Compensation Board the courts have no authority to substitute their own finding of fact for that of the board. It cannot be said that the testimony of appellee and Dr. Eversole does not amount to substantive and probative evidence. We think it is sufficient to sustain the finding of the board.

Judgment affirmed.